EMILIO M. GARZA, Circuit Judge,
dissenting:
The majority opinion almost gets it right. I agree with the majority’s conclusion that the Seed Merchants Endorsement to the CGL Policy and the Seed-men’s Limitation to the Umbrella Policy expands the coverage of these policies. I disagree, however, that these endorsements expand or modify the policies’ definition of “property damage.”
Because the Farmers’ complaint in the underlying litigation fails to allege “property damage,” within the meaning of these policies, I would find that Nationwide has no duty to defend or indemnify DPL and AFFIRM the judgment of the district court.[1]
The Seed Merchants Endorsement to the CGL Policy does not modify the definition of “property damage.” The plain language of the Endorsement specifies with the utmost precision the only portion of the policy which it modifies:
A. The following is added to paragraph 1. of COVERAGE A — BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I — Coverages):
1. Insuring Agreement,
d. Damages because of “property damage” include loss resulting from:
(1) The erroneous delivery of seed, which includes:
(a) The failure to deliver seed;
(b) The delivery of wrong seed; or
(c) The delivery of seed at the wrong time of season; or
(2) An error in mechanical mixture of seed.
(emphasis added). The language is clear; the Seed Merchants Endorsement only modifies the “Coverages” section of the policy.
“Property damage” is defined in the “Definitions” section of the policy, not the “Coverages” section. “Property damage” is a defined term in the CGL Policy. The term appears in quotation marks throughout both the policy and the Seed Merchants Endorsement. According to an introductory clause of the policy, “words and phrases that appear in quotation marks *405 have special meaning.” (emphasis added). For those meanings, the policy directs readers: “Refer to DEFINITIONS (SECTION V).” The “Definitions” section is a discrete part of the policy, separate and apart from the section on “Coverages.”
Because “property damage” is a defined term under the CGL Policy and because the Seed Merchants Endorsement expressly modifies only “Coverages” and not “Definitions,” the definition of “property damage” must be read as part of the endorsement, not as modified by it. The definition of “property damage” from the “Definitions” section thus governs both the CGL Policy and the Seed Merchants Endorsement. That definition requires either “physical injury to tangible property, including all resulting loss of use of that property” or “loss of use of tangible property that is not physically injured.”[2]
Likewise, the Seedmen’s Limitation to the Umbrella Policy does not modify that policy’s definition of “property damage.”[3] In full, the Seedmen’s Limitation provides: “The most we will pay under this policy is $10,000,000 for losses arising out of the mislabeling, misdelivery, or error in mechanical mixture of seed. All other conditions and provisions of the policy remain unchanged.” The Seedmen’s Limitation, like the Seed Merchants Endorsement, contains no language that alters the definition of “property damage” under the Umbrella Policy.[4]
The majority’s reading of these endorsements eviscerates the need to allege a *406 physical injury to tangible property where, as here, the complaint alleges an error in the mechanical mixture of seed. The majority’s reading redefines “property damage” to mean any loss resulting from “an error in mechanical mixture of seed.” This is a dramatic alteration to the definition of “property damage” as that term is defined in these policies. Because there is no indication from the plain language of either the Seed Merchants Endorsement or the Seedmen’s Limitation that such a sweeping result was intended, I reject the majority’s conclusion that such a reading of these endorsements is reasonable.[5]
The only question remaining is whether the Farmers’ complaint in the underlying litigation alleges damages because of “property damage,” as defined in either the CGL Policy or the Umbrella Policy. Under either policy, the Farmers must have alleged “physical injury” to “tangible property” or the “loss of use of tangible property.” (emphasis added).
The Third Amended Complaint in the underlying action by the Farmers alleges that DPL “was negligent and their actions fell below acceptable standards of care” by “negligently blending old seed with new seed, thereby decreasing seed vigor and reducing the yield [of the cotton crop] produced.”
Further, the complaint alleges: “Plaintiffs suffered a loss of yield and economic damages. Specifically, Plaintiffs suffered lost proceeds from decreased production of NuCotn 33B [(a DPL cotton seed variety)].” (emphasis added). The Farmers claim that the inferior seed caused the Farmers “to obtain cotton yields substantially less than they would have obtained had the seed been of proper quality.” (emphasis added). The Farmers were allegedly “subjected to severe mental anguish and pain in having to watch their crops grow and eventually realize that their cotton crops were not going to yield amounts which they would have normally expected.” (emphasis added). The Farmers claim that DPL denied them “their rightful economic benefits expected from the cotton crop.” (emphasis added). The Farmers complain that they “were not able to make sufficient yields as were represented and were therefore unable to receive the expected monetary return from the cotton grown.” (emphasis added). The Farmers claim that DPL interfered with their “prospective economic opportunities.”
As for damages, the Farmers “demand compensatory damages for the negligent, or alternatively, intentional economic loss they sustained as a result of the seed in question and additionally demand compensatory damages for mental pain and anguish in an amount to be determined by the trier of fact.” (emphasis added).
The Farmers complain about reduced crop yield. The seed they purchased from DPL did indeed germinate and produce crops, albeit a smaller yield than that apparently anticipated by the Farmers. The complaint seeks damages for economic *407 losses sustained by the Farmers, compensatory damages for mental pain and anguish, and punitive damages for DPL’s “willful, wanton, and malicious” or “grossly negligent” acts. However, all of these allegations stem from the allegedly reduced yield. The complaint contains no allegation that the Farmers’ cotton crops or other tangible property were physically injured or that there was a loss of use of the cotton, the seed, or any other tangible property.
Under Mississippi law, “economic losses are not ‘property damage.’ ” Audubon Ins. Co. v. Stefancik, 98 F.Supp.2d 751, 756 (S.D.Miss.1999) (citing Snug Harbor Ltd. v. Zurich Ins., 968 F.2d 538, 542 n. 13 (5th Cir.1992)). The losses claimed by the Farmers are essentially for a loss or diminution of value to their cotton crops for the season in question. This diminution in value stems from alleged reduced yield of the seed, not from any actual physical injury to the crops or other tangible property. The injuries alleged in the Farmers’ underlying complaint thus do not constitute “property damage” within the meaning of the CGL Policy or the Umbrella Policy.[6]
Because the Farmers’ complaint fails to allege “property damage” within the meaning of the CGL Policy or the Umbrella Policy, the district court correctly concluded that Nationwide’s duty to defend or indemnify DPL was never triggered. The majority’s opinion concludes otherwise, and therefore I respectfully dissent.

. Although not pertinent to my discussion of "property damage,” I also disagree with the majority's analysis of whether the Seedmen's Modified Liability Coverage Endorsement excludes coverage in this case. However, because DPL failed at the threshold to establish that the Farmers’ complaint alleges damages because of "property damage,” it is unnecessary to analyze whether any exclusions apply, and I will not address the issue further.

. The majority rejects this reading of the Endorsement, reasoning that the reading "does not logically follow” and "would make part A of the Endorsement a meaningless and ineffectual provision.” I disagree.
The Endorsement serves at least two purposes. First, the Endorsement clarifies that the generic language of the CGL Policy extends to risks related to the core business activities of the insured as a seed merchant. Second, the Endorsement extends coverage to risks that might otherwise be excluded by Exclusion "m" of the policy.
Exclusion “m” in the CGL Policy excludes coverage for certain risks arising from the defective design of the insured’s product or the insured's failure to perform on a contract. See Appleman on Insurance, § 132.9 (2d ed.2007) (describing this exclusion as the "Design Error” exclusion or the "Failure to Perform” exclusion, the purpose of which "always has been to exclude the 'loss of use’ of property that results in claims because of actions in the named insured's control”). The enumerated risks in paragraph A of the Endorsement — the “erroneous delivery of seed” or "error in mechanical mixture of seed” — are the sorts of risks that might be excluded under Exclusion "m.” However, paragraph B of the Endorsement provides that Exclusion "m” does not apply to any “property damage” described by the enumerated risks added to the insuring agreement in paragraph A.
Paragraph A is not meaningless and ineffectual. Paragraph A describes a narrow set of risks that paragraph B then expressly removes from the scope of Exclusion "m.” Thus, the Endorsement, through the interaction of both paragraphs A and B, effectively creates an exclusion to the exclusion and, in doing so, expands the coverage of the policy.

. The definition of "property damage” in the Umbrella Policy is similar to that of the CGL Policy. The Umbrella Policy defines "property damage” as "physical injury to or destruction of tangible property ... including all resulting loss of use of that property” or "loss of use of tangible property which has not been physically injured or destroyed.”

. Because the Seedmen's Limitation contains no express limitations describing what part of the policy it modifies, the majority urges that it is reasonable to read the Limitation "as a modification of the entire policy, including the coverage and ‘property damage’ definition.” Under Mississippi Law, "unless the clause of an insurance agreement is ambiguous it should be enforced as written.” United States Fid. & Guar. Co. v. Omnibank, 812 So.2d 196, 200 (Miss.2002) (en banc). The language of the Limitation speaks for itself. The Limitation does not even mention “property damage.” There is no language in that provision that renders "property damage” — a defined term with special meaning under the *406 Umbrella Policy — -ambiguous. Reasonable readings and possible readings are not the same thing.

. The majority's reliance on Ranger Ins. Co. v. Globe Seed & Feed Co., Inc., 125 Or.App. 321, 865 P.2d 451 (1993) is misplaced. The majority relies on this non-binding Oregon authority to support an argument that the definition of "property damage" may differ as a matter of law depending on the nature and purpose of a particular liability policy. While this is no doubt true, a finding that a defined term in the policy is modified by some other provision of the policy, such as an endorsement, must be supported by the plain language of the policy. The plain language of the endorsements in these policies does not support the majority’s conclusion that the term "property damage” was modified or redefined.

. In discussing whether any exclusion applies, the majority states that the Farmers complain of “damage to the Farmers’ crop land's use, i.e., their crop yield.” Nowhere in the complaint do the Farmers' complain about damage to their land use. If they did, this might be a different case. Rather, the Farmer’s complaint is framed in terms of the economic losses they sustained as a result of the less-than-anticipated yield allegedly occasioned by the defective seeds.